(116 So. 834)

No. 28913.

**ELY v. COREIL.**

April 9, 1928.

W. C. Perrault and George K. Perrault, both of Opelousas, for appellant.

Dubuisson, Perrault & Burleigh, of Opelousas, and J. Hugo Dore, of Ville Platte, for appellee.

OVERTON, J. Plaintiff is the legitimated natural daughter of John Ely, who died on or about September 1, 1922. Ely was twice married, though left no children by either marriage. His first wife was Marie Jacobs, who died on February 11, 1907, and his second wife was Zelia John, who survives him. During the existence of the community of acquets and gains that existed between Ely and his first wife, Marie Jacobs, certain property was acquired, which is the property in dispute here. Marie Jacobs left at her death no ascendants, descendants, or legitimate collateral relations. Under the law as then existing, her husband was therefore her irregular heir. He, however, took no steps to open her succession, or to have himself recognized as her heir and placed in possession of her estate, including her half interest in the property in dispute, upon complying with the law, but continued in possession of the property in controversy, it is contended by plaintiff, until his death, and by defendant, until Ely sold it to him. On November 23, 1921, Ely executed by notarial act what purports on its face to be an absolute sale to Armand Coreil, the defendant herein, of the land in contest here, consisting of his farm, and a few acres of woodland, for the recited consideration of $3,500 cash. Prior to the execution of this act, Ely had mortgaged the property described in it to defendant.

Plaintiff brought the present suit to annul the sale of said property, to reduce the special mortgage granted by Ely, and, in the alternative, to recover the one-half undivided interest in said property formerly owned by Ely's first wife by virtue of her interest in the community of acquets and gains that existed between her and Ely, and for other purposes unnecessary to mention.

The grounds alleged for annulling the sale, to quote them from plaintiff's petition, are:

"(1) That the consideration of the said sale is totally inadequate and out of all proportion to the value of the property conveyed.

"(2) That John Ely, the supposed vendor, remained in possession of the said property until his death in August, 1922, and that the said Coreil during the latter part of October, 1922, for the first time asserted his pretended rights of ownership by ousting by force the wife and tenants of the said Ely, at the same time appropriating to his own use, and illegally taking possession of, not only the property covered by the said pretended sale, but likewise all of the livestock and implements found on the said land.

"(3) That the said sale constituted a transfer at one time of all of the immovable property of the said Ely, a sale 'omnium bonorum', which of itself is a presumption of simulation.

"(4) That the vendee in the said sale was also the mortgagee who dealt with a man of advanced age, growing weak in mind and body, and additionally handicapped by illiteracy.

"(5) That the consideration of said sale was not paid to the vendor.

"(6) That, while the sale appears to have been passed before two witnesses, in truth and in fact only one witness was actually present at the time the said sale was passed, and that witness was, and still is, an employee of the vendee.

"(7) That, notwithstanding the fact that the supposed consideration of the said cash sale would have given the vendor, over and above the supposed outstanding special mortgage, an amount approximating $1,200, in cash, the said John Ely, the vendor, at his death, approximately nine months thereafter, left only ten ($10) dollars in cash and no property other than the live stock and implements above referred to, and a small quantity of household effects."

In a supplemental petition, plaintiff alleges that Ely was a man of advanced age, no longer able to transact business of an important nature, that his inability to transact such business was known to defendant, who took advantage of it to induce him, by falsely representing that the act of sale was the renewal of a mortgage, to sign it; and in that petition plaintiff also alleges that Ely could not,

under the terms of article 932 of the Civil Code, legally mortgage or sell the one-half interest that belonged to his wife, Marie Jacobs, in said property, and that, in any event, she is entitled, as the forced heir of her father, John Ely, to be placed in possession of that one-half interest, free from any incumbrances whatever, upon complying with articles 930 and 931 of the Civil Code.

After defendant put these demands at issue, the case was tried. On the trial it appeared from defendant's evidence, including an itemized account filed by him, that, on November 27, 1917, Ely opened an account with defendant, and that, on September 20, 1918, the account was closed by the execution of a note, made by Ely for $614.59. Another account was opened by Ely with defendant on the same day, upon which the note given was entered as the first item. On October 24, 1919, the account, including the note given, and interest, amounted to $1,135, and was closed by the execution of another note, made by Ely, for $1,135, secured by mortgage on the property in contest herein. Another account was opened immediately thereafter, upon which was carried as a debit the mortgage note for $1,135. On October 7, 1920, the account, including the mortgage note and interest, amounted to $2,136. On that day it was closed by the execution of a new note for that sum, secured by mortgage on the same property. Another account was opened immediately, upon which was carried as a debit the mortgage note last given. On November 23, 1921, the account, including the mortgage note and $35.60 interest thereon, after allowing credits, amounted to $3,453.42. On that day defendant paid Ely $64.57 to bring the account up to $3,500, and on the same day the property mortgaged was transferred by Ely to defendant for the recited consideration of $3,500 cash. Defendant testified that the true consideration for the transfer was not $3,500 cash, but the payment of the account, amounting to $3,453.43 and the $64.57, paid to bring the account up to $3,500, the recited consideration for the property. The accounts consist largely of debits for merchandise sold Ely by defendant, of a few charges for notes paid by defendant, which were executed in favor of others by Ely, a few debits for money advanced by defendant to Ely, and a few items showing accrued interest.

Plaintiff takes the position that these accounts are greatly inflated. She urges that many of the items contained in them, showing charges for merchandise sold, disclose that the prices charged greatly exceed the retail prices; that usurious interest was charged and carried into the account; that the evidence does not establish the correctness of the charges, or of all of them, for cash advanced; and that these should be stricken from the accounts, or their total reduced in the sum of $801.10, by striking therefrom two items aggregating that amount. Pursuing these contentions to a conclusion, plaintiff urges that the following deductions at least should be made from the accounts: Interest $159.40; merchandise $832.30; cash $801.10—making a total deduction that should be made of not less than $1,792.80, which, when deducted from the consideration of $3,500, recited in the deed as having been paid for the property, leaves the consideration actually paid not more than $1,707.20. Plaintiff, then taking the position that the value of the property, at the time it was conveyed, was as shown by the evidence, $4,820, argues that the consideration was inadequate to support a sale, and that, since Ely remained in possession after the sale was passed up to his death, the sale should be held to be a mortgage, and the amount secured by it should be reduced to the amount actually due, which, as stated, plaintiff contends does not exceed $1,707.20.

To establish that the amount shown by the account as due is excessive, plaintiff offered

evidence to show that Ely was frugal through life; that he had no one but his wife dependent upon him for support; that he farmed his land wholly or largely on the share system; that he raised most of the things he needed to eat; that one in his position should have gotten along on approximately $100 a year in cash, or in other words, with purchases, consisting of the necessities of life, in that amount. Plaintiff also offered evidence to show that a number of items on the accounts for merchandise sold are charged at excessive prices—in some instances from 25, 35, and 50 per cent., or even more, beyond the usual retail prices prevailing in that locality at the time of sale. Plaintiff, in this connection, as stated, contends that the account contains charges for usurious interest, not only on its face, but in the items charged for merchandise, treating, as we appreciate it, the alleged excessive charges in those items as interest, and that some of the charges for money advanced, if not all of them, have not been proved.

The only charge for interest at a usurious rate that we find, appearing on the face of the account, is one of $5, entered on September 18, 1919. However, immediately below that charge is a credit showing "allowance of interest to date," entered on the day the account for that year was closed, of $6.90. In the absence of anything appearing to the contrary, it is fair to assume that that allowance, in part, was made to offset the charge of $5. We may say in this connection that, were we to strike from the accounts all of the charges for interest appearing on their face, still the reduction would be too small to affect the issue here presented.

With reference to the contention that the items for merchandise sold contain charges of usurious interest, it may be said that defendant, while testifying concerning some of these items, said that he had a cash price and a credit price for merchandise; that this was explained to his customers, who accepted the goods or not at those prices, according to their wishes. While defendant sometimes refers to these increases in prices as interest charges for agreeing to carry the account for a long period, still we think that his evidence, as a whole, shows that, in reality, they are nothing more than increases in the prices, in consideration of terms of credit to be extended, to which plaintiff consented.

After all of plaintiff's evidence, tending to show that the accounts are inflated and incorrect, is considered, we are still confronted with the fact that defendant testified that they are correct, and especially with the fact that, when the time for settlement came in the first year for which the credit was given, Ely approved the account for that year by giving his note in settlement, and did likewise in each succeeding year, the note for such year including the note or notes for the preceding year or years, until the last year, when he transferred the property in contest here to defendant in payment of the indebtedness due. These written acknowledgments, supported by defendant's evidence, relating to the correctness of the accounts, overcome the foregoing evidence introduced by plaintiff.

But plaintiff urges that these acts of Ely are not entitled to weight, because he was illiterate, and, due to advanced age, was weak mentally, being at the time the transactions were finally closed about 82 years of age. He was illiterate. With reference to his mental condition, there is evidence tending to show that his mind was not good, but, on the other hand, there is evidence tending to show that it was. After considering the evidence touching the matter, our conclusion is that, while he may have been a little childish at times, yet that he was able to attend to this matter, and knew what he was doing. He was actually engaged in the affairs of life up to that time, and apparently until his death.

The contention of plaintiff that the transfer of the property in dispute from Ely was obtained by defendant under representations that the act by which the transfer was made was the renewal of a mortgage, or the granting of a mortgage, is not established by the evidence. The only evidence tending to show that Ely was under the impression that the act was a mortgage is the statement of a witness to the effect that Ely, during his last illness, stated that the property was mortgaged, but that there would be something substantial left, after the mortgage was satisfied. This statement is purely hearsay, and, if made, is entitled to no weight. Moreover, defendant testified that, when he finally demanded payment, after some negotiations, Ely offered to transfer the property to him in settlement of the indebtedness, and the conveyance was then made.

As relates to the contention that Ely remained in possession of the property as owner until his death, the contention is not borne out by the evidence. It is true that, while Ely continued to live on the property until his death, which occurred within a year after the conveyance was made, and to cultivate it through tenants, yet immediately after the transfer he leased the property from defendant, and executed in favor of defendant his note for the rent. The evidence in the record does not justify us in concluding that this lease was not a genuine act. Therefore, after the sale, Ely occupied the property merely as defendant's tenant. In this connection we may say that the contention that, after Ely's death, defendant took possession forcibly, not only of the property in contest here, but also of certain personal property on the place in like manner, is not supported by the evidence. While defendant took possession of the property about the time of the termination of the lease, and also of some live stock and other personal property, yet he did not do so forcibly, but took

possession of the realty under the sale to him, and of the personal property under a conveyance made by Ely to him, in partial satisfaction of a chattel mortgage, given to secure a loan. This loan, we may say, we do not find included in the account, forming the basis of the transfer of the realty.

Before leaving this phase of the case, we may say that it is a matter of no consequence whether only one witness was present when the notarial act of the transfer of the realty was passed. It is true that a notarial act must be passed before a notary in the presence of two witnesses. But the transfer would have been valid had it been by private act. The only question in that event would have been whether the evidence showed that the act had been signed by the parties. In this instance it is admitted that the act was signed by them. Nor is the sale of all of one's immovable property, or, for that matter, of all of one's personalty and realty, by the same act, or at the same time, which is not strictly the case here, as the realty and personalty were not sold at the same time, necessarily a badge of simulation. Where a person, however, sells all of his property, out of the ordinary course of business, at the same time, leaving creditors unsatisfied, it is a circumstance indicating simulation. But it does not appear that such was the case here. Moreover the sale was unquestionably supported by a consideration.

For the foregoing reasons, our conclusion is that no legal grounds appear to justify us in annulling the sale of the realty and declaring it a mortgage, granting which we assume to be the case, that a sale absolute on its face, when attacked by a forced heir, may be annulled by parol evidence and declared to be a mortgage or pignorative contract. Possession of the property was delivered, the consideration was not vile, and the remaining circumstances do not justify such action. Nor is there any ground to an-

nul the sale, treating it as a sale, for lesion beyond moiety, if that ground be considered before us. The consideration exceeds by far one-half of the value of the property, at the time of the transfer, accepting the value to have been, as contended for by plaintiff, $4,820. C. C. art. 1861.

The remaining contention to be disposed of relates to plaintiff's right to recover the undivided half interest in the realty sold that belonged to Ely's first wife, Marie Jacobs, by virtue of the community of acquets and gains that existed between the latter and her husband. As we have said, Marie Jacobs left no ancestors or descendants or collateral relations at her death. Ely was therefore her heir. As her succession was an irregular one, although apparently consisting of her interest in the community, she having died prior to the passage of Acts 57 of 1910 and 80 of 1916, he should have complied with articles 930 and 931 of the Civil Code before taking possession of her estate as heir. Article 931 requires, among other things, that the husband or wife, as the case may be, where either is called to the succession of the other, shall furnish security for the purpose of securing the restitution of the estate in case any heir should come forward within the space of three years, after the husband or wife has been put into possession, after which period the security shall remain discharged. Article 932 prohibits the husband or wife during the period that the security remains in force, from alienating the immovable property belonging to the succession of which either has been placed in possession, except under the authority of the court, at public auction, and in cases in which its alienation is deemed necessary.

The provisions of articles 931 and 932 are provisions in the interest of the heirs by blood of the deceased. No one else including the public, is concerned in the matter. They are not provisions in the interest of public order. No one but an heir may complain of the

failure to comply with these provisions. He alone, on appearing and establishing his heirship may annul a mortgage or a sale made in contravention of article 932. The surviving spouse, after having transferred the interest owned by his deceased wife, especially where he warrants the title, as is the case here, cannot sue to annul the transfer. A case where the surviving spouse so sues is unlike Ackerman v. Larner, 116 La. 101, 40 So. 581, and Kelly v. Kelly, 131 La. 1024, 60 So. 671, where laws enacted in the interest of public order were violated. When the law prohibits an act, but does so from no motive of public policy or utility, the nullity is deemed relative only, and may be invoked alone by those in whose interest the prohibition is made. Hughes v. Edson, 129 La. 866, 870, 57 So. 154; Whitehead v. Wiley, 9 La. Ann. 214; Whitehead v. Cramer, 9 La. Ann. 216. Plaintiff having accepted the succession of her father, and especially as she has done so unconditionally, is without right to sue to recover this undivided interest on the ground here relied upon. As his heir, she is bound in this respect by his act. Compare Griffing v. Taft, 151 La. 442, 91 So. 832, on rehearing, and Berry v. Wagner, 151 La. 456, 472, 91 So. 837.

For these reasons, the judgment appealed from is affirmed.